Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J.G., and E.P.,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, and UNITED BEHAVIORAL HEALTH.<br><br>　　　　Defendants. | COMPLAINT<br><br><br><br>Case No. 1:22-cv-00134 – CMR<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiffs J.G. and E.P., through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company, and United Behavioral Health (collectively "United") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. J.G. and E.P. are natural persons residing in Teller County, Colorado. J.G. is E.P.'s mother.

2. United Healthcare Insurance Company is headquartered in Hennepin County, Minnesota and was the insurer and claims administrator as well as the fiduciary under ERISA for the

1

insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

3. United Behavioral Health is the mental health arm of United Healthcare Insurance Company and processed essentially all the claims and appeals at issue in this case.

4. The Plan is a fully insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). J.G. was a participant in the Plan and E.P. was a beneficiary of the Plan at all relevant times. J.G. and E.P. continue to be participants and beneficiaries of the Plan.

5. E.P. received medical care and treatment at Elevations Residential Treatment Center ("Elevations") from November 2, 2020, to June 30, 2021. Elevations is a licensed treatment facility located in Davis County Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. E.P. attended the Elevations Seven Stars program which specifically focuses on treating individuals on the autism spectrum.

6. United denied claims for payment of E.P.'s medical expenses in connection with his treatment at Elevations.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah, United Behavioral Health has a large claims facility in Salt Lake City, Utah where the appeals were sent for processing, and the treatment at issue took place in Utah.

9. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

**BACKGROUND FACTS**

**E.P.'s Developmental History and Medical Background**

11. E.P.'s delivery was very difficult and full of complications such as the umbilical cord wrapping around his neck. E.P. suffered from severe jaundice, he had frequent infections, and had to seek physical therapy due to a curved spine.

12. E.P. showed signs of significant anxiety from a young age. He would chew on things like his shirtsleeves and would lick his lips until they nearly started bleeding. E.P. was frequently disruptive while in school and was bullied by other students. E.P.'s parents split up when he was in the third-grade and he started acting out more and more.

13. Although he had previously been in the gifted program, E.P. repeated the third-grade. E.P. experienced passive suicidal ideation and believed that he "would be better off dead."

14. E.P. was given a Neuropsychological Evaluation in the sixth grade and although he would later be diagnosed as being on the autism spectrum, he did not receive that diagnosis and that prevented him from getting early intervention for this condition.

15. By the time he was in high school, E.P. started showing increased signs of depression. He had to be reminded to do basic everyday things like shower or brush his teeth and he was officially diagnosed as being on the autism spectrum. E.P. started using this diagnosis as a crutch to further isolate and avoid his responsibilities.

16. E.P. had significant academic struggles in the tenth grade when his school switched to an online curriculum without set due dates. In addition, E.P.'s support team in the special education department changed. E.P. tended to be very rigid and had difficulty adapting to changes, which was exacerbated even more by the start of the COVID 19 pandemic.

17. E.P. became increasingly withdrawn. He failed his classes and did not pass the tenth grade. E.P. was significantly underweight and showed signs of an eating disorder. He would refuse to eat many foods due to issues like texture. He also struggled to perform activities of daily living. E.P. also had a speech processing disorder which often caused him to have difficulty understanding spoken information.

**Elevations**

18. E.P. was admitted to Elevations on November 2, 2020, with United's approval.

19. In a letter dated December 8, 2020, United denied payment for E.P.'s treatment at Elevations from December 9, 2020, forward. The letter gave the following justification for the denial:

> We've denied the medical services requested by your provider's designee for Mental Health Residential Treatment as of December 09, 2020.
>
> You are being treated for depression, anxiety and thoughts of self-harm.

> Your request was reviewed. We have denied the medical services requested because we talked to your provider's designee.
>
> The criteria are not met because:
>
> - You are doing better.
> - Your mood is improved.
> - You are not having any thoughts to harm self or others.
> - You are not engaging in any self-har, [sic] behavior. You are not behaving aggressively.
> - You are taking your medications.
> - Your family is supportive and involved in your treatment.
> - You no longer require twenty-four (24) hour nursing care.
>
> Care and recovery could continue in the Mental Health Partial Hospitalization Program Setting.
>
> Please discuss these options with your provider.
>
> The Guideline/Policy/Criteria used for the decision is:
>
> The American Academy of Child and Adolescent Psychiatry (AACAP) Child and Adolescent Service Intensity Instrument (CASII) Version 4.1 for Level 5 - Non-Secure 24-Hour Services with Psychiatric Monitoring, which is applicable to the Mental Health Partial Hospitalization Level of Care.

20. On March 15, 2021, J.G. submitted a level one appeal of the denial of payment for E.P.'s treatment at Elevations. J.G. reminded United that she was entitled to certain protections under ERISA during the review process, including a full, fair, and thorough review conducted by appropriately qualified reviewers which took into account all of the information she provided, gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave her the information necessary to perfect the claim.

21. She asked that the reviewers have experience treating individuals with E.P.'s mental health diagnoses.

5

22. She also asked to be provided with a copy of all documentation related to the appeal determinations, including the reviewers' internal case notes. In addition, because the denial appeared to be based on a composite score, she also asked to be provided with these sub-scores as well as the reviewer's notes concerning these scores.

23. J.G. argued that United's criteria violated generally accepted standards of medical practice and, among other things, overemphasized acuity, failed to address the effective treatment of co-occurring conditions, pushed individuals into a lower level of care regardless of whether it was safe or effective to do so, failed to address the needs of children and adolescents, and approved or denied care based primarily on whether mandatory prerequisites were met.

24. She pointed out that United had approved the initial stages of E.P.'s treatment, even though he was not suffering from "thoughts of harm to self or others" or "engaging in any self-har[m] behavior" during these dates.

25. She asked why these factors suddenly became an issue on December 9, 2020, when United elected to deny further payment, when they had not previously merited a denial of treatment.

26. She wrote that E.P. was "doing better" and his mood had improved specifically because he was receiving treatment at Elevations. She argued that without this treatment E.P. was at risk of "relapse or regression," forcing him to be stabilized at a higher level of care.

27. She quoted the Plan's definition of medical necessity and argued that E.P.'s treatment met this definition. She expressed concern that United's denial was in violation of the federal Mental Health Parity and Addiction Equity Act ("MHPAEA").

28. She wrote that it appeared United was requiring individuals receiving sub-acute mental healthcare to be experiencing acute level symptoms, but it did not do this for sub-acute medical or surgical care.

29. She asked that United to perform a parity compliance analysis under MHPAEA and asked for a physical copy of the results of this analysis. She also asked for information concerning the development and implementation of United's acute care limitation.

30. She included copies of E.P.'s medical records and a letter of medical necessity with the appeal. In a letter dated January 21, 2021, Joy Buckley, MA, LPC, LAC, wrote in part:

    > I began seeing [E.P.] in 2012 for anger issues and difficulties in school. He had been diagnosed with ADHD and received special services at school. Mostly using the modality of Play Therapy combined with Animal Assisted Therapy, we were able to develop a rapport. At that time, he was not diagnosed with being on the Autistic Spectrum.
    >
    > There was a gap of time that I did not see [E.P.], but when he began the transition into adolescence, new concerns arose. School continued to be an issue, and an eating disorder had emerged. As he re-engaged in therapy, it became clear his issues were beyond my scope. Despite the strong support from his mother and family, he exhibited signs of depression and was unwilling to engage in therapy. A residential treatment program was proposed and, by all accounts had been very successful.
    >
    > I strongly support the continuation of this program and I am thrilled that it exists to help individuals like [E.P.]. [E.P.] deserves the chance to live normally and adjust as he transitions into adulthood. The qualified professionals he works with in this specific program are his best chance for a successful outcome.

31. J.G. asked that in the event United maintained the denial, she be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination, along with their medical or surgical equivalents (whether or not these were used, so that she would be

7

able to assess the Plan's compliance with MHPAEA), along with any reports or opinions regarding the claim from any physician or other professional, as well as their names, qualifications, and denial rates. (collectively the "Plan Documents")

32. In a letter dated April 16, 2021, United upheld the denial of payment for E.P.'s treatment. The letter gave the following justification for the denial:

    > We reviewed your medical records and clinical case notes. The facility designee was not available to complete a live discussion of your case during the scheduled time.
    >
    > The criteria are not met because: You do not need the care provided in the Residential Treatment setting.
    >
    > In your case: You are cooperative and actively participating in your treatment. You are medically stable. You are able to learn and use coping skills. You are taking your medications and doing better. You are less depressed and less anxious. You have a more stable mood. You are not acting on every impulse. You are not harming yourself or others and have no unsafe thoughts. You are able to look after your day to day needs. You do not have clinical issues requiring 24 hour monitoring in a residential setting. You have a safe place to live and the support of family.
    >
    > Care and Recovery could continue in the Mental Health Intensive Outpatient Program setting. Please discuss these options with your provider.
    >
    > The Guideline/Policy/Criteria used for the decision is: The American Academy of Child and Adolescent Psychiatry (AACAP) Child and Adolescent Service Intensity Instrument (CASII) Version 4.1 for Level 5 - Non-Secure 24-Hour Services with Psychiatric Monitoring which is applicable to the MENTAL HEALTH RESIDENTIAL TREATMENT level of care.

33. On May 25, 2021, J.G. submitted a level two appeal of the denial of payment for E.P.'s treatment. She argued that United had not given her the full, fair, and thorough review to which she was entitled and that it continued to violate generally accepted standards of medical practice.

34. She wrote that she had contacted Elevations and despite United's claim that it had reached out to the facility, Elevations denied that any attempt at contact was made. She

stated that United continued to ignore the arguments she had raised, and despite her clear and explicit requests for documents such as the individual CASII sub-scores, United made no attempt to provide her with these materials.

35. She similarly alleged that United made no attempt to address her concerns regarding a violation of MHPAEA, and there was no indication that it conducted any sort of parity analysis. She asked how she was supposed to have any confidence that United was properly administering the Plan when it refused to provide the documents and information she requested.

36. She stated that this hindered her ability to effectively appeal the denial, and again requested these materials, including a copy of the Plan Documents. She also included a psychological evaluation conducted while E.P. was at Elevations which outlined his struggles with autism, and which recommended that he complete the program at Elevations.

37. She again asked what changed so drastically in E.P.'s conditions which supported United's position that E.P.'s treatment was medically necessary from November 2, 2020, through December 9, 2020, but supposedly made his treatment no longer necessary after those dates.

38. In a letter dated June 7, 2021, United upheld the denial of payment for E.P.'s treatment. The letter gave the following justification for the denial:

> Taking into consideration the available information and the locally available clinical services, along with the not having any additional clinical information from provider [sic] in support of the appeal, it is my determination that the requested service did not meet the guideline/policy/criteria required to be followed in the member's behavioral health plan benefits as of December 9, 2020. Specifically: The member's clinical condition appears to have improved and stabilized to the extent that he no longer requires a facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral

9

health treatment to continue with recovery. He consistently denies suicidal intent or homicidal thoughts and is not self-harming or aggressive. There were no unsafe thoughts or dysregulated behaviors. He is cooperative, responsive to staff, medication adherent, and doing better. He is medically stable, with adequate sleep, appetite and self-care. He is not having medication side effects or showing acute impairment to behavior or cognition. He remains somewhat reactive with hyperactive and impulsive behaviors consistent with ADHD, and he is at times isolative and anxious, but his remaining symptoms can be safely treated in a less intensive setting. Medication changes from 12/09/20 and forward could have been safely managed at a lower level of care.

Care and Recovery could continue in the Mental Health INTENSIVE OUTPATIENT PROGRAM Level of Care.

Your provider requested second level appeal. [sic] We reviewed clinical case notes. The facility designee was not available to complete a live discussion of your case during the scheduled time.

We have upheld a denial for the medical services requested. MENTAL HEALTH RESIDENTIAL TREATMENT Level of Care from December 9, 2020 and forward. We upheld a denial because criteria were not met for this level of care.

The criteria are not met because: You do not need the care provided in the RESIDENTIAL TREATMENT setting.

In your case: facility did not provide any additional information. As was stated before, your condition had improved. You are cooperative and actively participating in your treatment. You are medically stable. You are able to learn and use coping skills. You aretaking [sic] your medications and doing better. You are less depressed and less anxious. You have a more stable mood. You are not acting on every impulse. You are not harming yourself or others and have no unsafe thoughts. You are able to look after your day to day needs. You do not have clinical issues requiring 24 hour monitoring in a residential setting. You have a safe place to live and the support of family.

39. On September 28, 2021, J.G. requested that the denial of payment for E.P.'s treatment be evaluated by an external review agency. She asked that the external reviewer be appropriately qualified with experience treating individuals with E.P.'s diagnoses.

40. She asked that the reviewer take into account all of the evidence she provided and expressed concern that United's denial letters made no reference to any of the medical records or other documentation that she had provided.

41. She wrote that United continued to violate her rights under ERISA. She pointed out that United had conducted an urgent review despite never requesting this, and it had also misclassified her member appeal as a provider appeal. She stated that United continued to withhold the documentation she had requested and, rather than relying on any particular clinical evidence, had "made a number of generic statements" which ignored E.P.'s history and treatment needs.

42. She contended that United continued to violate generally accepted standards of medical practice and accused it of denying payment arbitrarily without actually relying on the criteria to which it attributed the adverse determination.

43. She stated that United continued to give no indication that it had taken into account any of her arguments, including her contention that it violated MHPAEA, and that it continued to justify its denial through the imposition of acute level requirements for a non-acute level of care. She again asked for a copy of the Plan Documents.

44. In a letter dated January 28, 2022, external review agency Maximus Federal Services, Inc. upheld the denial of payment for E.P.'s treatment. The letter does not reveal the identity of the reviewer and attributes it both to a "Maximus Physician Reviewer" and a "Maximus physician consultant" it is unclear from the ambiguous phrasing in the letter whether these are the same individual.

45. The letter stated in pertinent part:

> The results of the Maximus physician consultant's review indicate that this case concerns an 18 year-old male with a diagnosis of major depressive disorder, recurrent episode with psychotic features, generalized anxiety disorder, attention-deficit/hyperactivity disorder, combined presentation, autistic disorder, and learning disorder. The issue in this appeal is whether it was medically necessary for the member to be treated at the residential treatment level of care beginning 12/9/20.

The Maximus physician consultant noted that the member was admitted to the treating facility on 11/2/20. The Maximus physician consultant also noted that the member had difficulty with depression and anxiety. The Maximus physician consultant indicated that the member had not been doing well in school and had been living with his grandparents for eight months while attempting to complete school. The Maximus physician consultant indicated that the member had participated in remote online gaming for long hours without limitation. The Maximus physician consultant also indicated that the member's mother had been concerned about him turning 18 years of age and his lack of executive functions or ability to plan. The Maximus physician consultant noted that the member was originally admitted to the residential level of treatment with suicidal ideation, feeling sad, empty, and hopeless. The Maximus physician consultant also noted that based the case [sic] file documentation provided for review, the member had no suicidal or homicidal thoughts and he was reported to be in "no distress." The Maximus physician consultant indicated that the member had been actively engaged in treatment which included individual therapy, group therapy, family therapy, and individualized treatment. The Maximus physician consultant noted that the member was able to perform his activities of daily living independently.

The Maximus physician consultant explained that in a case such as this one, an evidence-based, objective instrument such as the American Association of Community Psychiatrists Level of Care Utilization System (LOCUS) can be used in determining the necessary level of care. The Maximus physician consultant noted that in terms of Risk of Harm on this system, the records support a score of 1 due to the lack of current suicidal ideation and no self-harming behaviors. The Maximus physician consultant also noted that regarding Functional Status, the records support a score of 1 due to no problems with transient impairment in functioning following exposure to an identifiable stressor. The Maximus physician consultant indicated that in terms of Medical, Addictive and Psychiatric Comorbidity, the records support a score of 1 due to overall medical stability. The Maximus physician consultant also indicated that in terms of Level of Stress of the Recovery Environment, the records support a score of 1 due to a stable living situation. The Maximus physician consultant further indicated that regarding the Level of Support for the Recovery Environment, the records support a score of 1 due to family support and availability of treatment resources, but also some difficulty in relationships with his family members. The Maximus physician consultant explained that regarding Treatment and Recovery History, the records support a score of 1 due to recent success at the residential treatment center level of care. The Maximus physician consultant noted that in terms of Engagement and Recovery Status, the records support a score of 1 due to cooperation in treatment and the member's insight into his treatment needs. The Maximus physician consultant explained that therefore, the member had a composite score of 7 which correlates to the community based outpatient clinic setting.

Pursuant to this information set forth above and attached documentation, The Maximus physician consultant has concluded that it was not medically necessary

      for the member to have been treated at the residential level of care beginning 12/9/20.

46. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

47. The denial of benefits for E.P.'s treatment was a breach of contract and caused J.G. to incur medical expenses that should have been paid by the Plan in an amount totaling over $130,000.

48. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of J.G.'s repeated requests.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

49. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

50. United and the Plan failed to provide coverage for E.P.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

51. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

52. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in J.G.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

53. United and the agents of the Plan breached their fiduciary duties to E.P. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in E.P.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of E.P.'s claims.

54. The actions of United and the Plan in failing to provide coverage for E.P.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

55. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for E.P.'s medically necessary treatment at Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

//
//
//

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 7th day of October, 2022.

By    <u>s/ Brian S. King</u>
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Teller County, Colorado